T.C. Memo. 2011-225


UNITED STATES TAX COURT


ROVAKAT, LLC, A PARTNERSHIP, SHANT S. HOVNANIAN,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3251-09.                    Filed September 20, 2011.


William R. Rankin, for petitioner.

Laurie A. Nasky and Justin D. Scheid, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  This case is a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 402, 96 Stat. 648.  Shant S. Hovnanian (Mr. Hovnanian), as the tax matters partner of Rovakat, LLC (Rovakat), petitioned the

Court to readjust partnership items that respondent adjusted for Rovakat's 2002 through 2004 taxable years. See sec. 6226(a).[1] Respondent's principal adjustment was to disallow Rovakat's claim to section 988 ordinary losses of $130,766 for 2002, $890,485 for 2003, and $2,479,991 for 2004. These losses stem from Rovakat's receipt of $34,185 in Swiss francs (francs) that, Mr. Hovnanian claimed, carried with them a $5,805,000 tax basis. Respondent determined that the claimed losses are not allowed because Mr. Hovnanian failed to establish Rovakat's basis in the francs. Respondent determined alternatively that the claimed losses are not allowed because the transaction underlying Rovakat's receipt of the francs (francs transaction) lacked economic substance. We agree with respondent on both points.[2]

We also decide the following secondary issues: (1) Whether Rovakat omitted income of $650,000 and $90,443 for 2002 and 2003, respectively. We hold it omitted income of $593,125 for 2002; (2) whether the period of limitations for assessment has expired as to Rovakat's 2002 taxable year. We hold it has not; (3) whether $593,125 and $943,192 of Rovakat's income for 2002 and 2003, respectively, is self-employment income. We hold it

---

[1]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[2]Respondent also determined that the losses were not allowed for other reasons. We do not address any of those reasons.

is; (4) whether Rovakat may deduct "other expenses" of $63,964 and $352,663 for 2003 and 2004, respectively.  We hold it may not; (5) whether the 40-percent accuracy-related penalty under section 6662(a) and (h) for gross valuation misstatement applies to any underpayment of tax attributable to the reporting of the losses of $130,766 for 2002, $890,485 for 2003, and $2,479,991 for 2004.  We hold it does; and (6) whether a 20-percent accuracy-related penalty under section 6662(a) and (b)(1), (2), or (3) for negligence or disregard of rules or regulations, substantial understatement of income tax, or substantial valuation misstatement, respectively, applies to any underpayment of tax attributable to the omitted income for 2002 and the disallowed deductions for 2003 and 2004.  We hold it does.

FINDINGS OF FACT

I. Preliminaries

The parties filed with the Court numerous stipulations of fact and accompanying exhibits.  The Court also deemed some facts and accompanying exhibits stipulated pursuant to Rule 91(f).[3] The stipulated facts, including those deemed established, and the accompanying exhibits are incorporated herein by this reference. We find the stipulated facts accordingly.

---

[3]We concluded that the deemed facts and documents were relevant to this case, and Mr. Hovnanian failed to show why the matters therein should not be deemed admitted.  See Rule 91(f).

## II.  Mr. Valdez

### A.  Background

Lance O. Valdez (Mr. Valdez) is a tax attorney who practiced law through his wholly owned professional corporation, Lance O. Valdez & Associates, P.C. (LOVA).  He also is a financial adviser who provided investment advisory services primarily through two other entities that he controlled, LVCM, Ltd. (Limited), and Lance Valdez Tax Management.

As part of his investment advisory services, Mr. Valdez structured and marketed tax-shelter transactions which generated for U.S. taxpayers superficial Federal income tax losses greatly disproportionate to economic outlay in the activities underlying those losses.  For the most part, Mr. Valdez designed and implemented these transactions, and he created the transaction documents effecting their implementation.  The documents were generally the same as to each transaction, except for the names of the parties to the transaction and the amounts involved.

### B.  Transactions Promoted

Mr. Valdez promoted his transactions as "investments".  While the transactions varied according to the entities, taxpayers, and assets involved, the transactions generally involved foreign property with significant built-in losses incurred by a foreign person not subject to U.S. tax, and used the same three steps.

As the first step in the transaction, a foreign entity, pursuant to an agreement with Mr. Valdez in which he agreed to pay the foreign entity a fee, transferred the built-in loss property with its purportedly high basis and a low fair market value (distressed assets) to a domestic partnership in exchange for an interest in the partnership. Second, the foreign entity sold a significant portion of its interest in the partnership to a U.S. taxpayer who was one of Mr. Valdez's "investors". Third, the partnership disposed of the distressed assets to formally trigger the built-in losses claimed to continue to inhere in the distressed assets, with those "losses" allocated to the U.S. taxpayer to offset the taxpayer's unrelated income otherwise subject to Federal income tax.

In total, Mr. Valdez's transactions caused over $147 million in "losses" to be allocated among his "investors" who did not actually realize economic losses of anywhere near the amounts allocated and who had minimal economic outlays in relation to the allocated "losses".

C. <u>IRS Investigates Mr. Valdez</u>

The Internal Revenue Service (IRS) investigated Mr. Valdez, LOVA, and Lance Valdez Tax Management as organizers, sellers, or promoters of potentially abusive tax shelters. That investigation led the IRS to examine Rovakat's 2002 through 2004

Forms 1065, U.S. Return of Partnership Income (2002 return, 2003 return, and 2004 return, respectively).

III. Rovakat

A. Formation of Rovakat

International Capital Partners, LP (ICP), and International Strategic Partners, LLC (ISP), formed Rovakat on June 6, 2002, as a Delaware limited liability company.[4]  Rovakat uses the cash receipts and disbursements method of accounting for Federal tax purposes, and Rovakat reports its income and expenses on the basis of the calendar year.  Rovakat's mailing address and registered office were in the third judicial circuit of the United States when the petition was filed.

B. ICP

1. Overview

Mosafa, Ltd. (Mosafa), and Credicom N.V. (CNV) formed ICP as a Cayman Islands limited partnership on May 7, 2001.  ICP conducted its activities and maintained its books and records in U.S. dollars.  Mr. Valdez controlled ICP at all relevant times.

2. Mosafa

Mosafa is a Cayman Islands company.  As part of ICP's formation, Mosafa transferred $1,000 to ICP in exchange for a 2-percent general partnership interest.

---

[4]Rovakat was originally named Radio & Wireless Software Development, LLC (Radio & Wireless).  We henceforth refer to Radio & Wireless as Rovakat.

3. CNV

CNV is a Belgian company that is a subsidiary of Immobilière Hôtelière, S.A. (Immobiliere), a French real estate and hotel conglomerate. CNV conducted its activities and maintained its books and records on the basis of the Belgian franc (Belgian franc). CNV's managing director was Henri Van Zeveren (Mr. Van Zeveren), a Belgian citizen and resident. As part of ICP's formation, CNV contributed $49,000 to ICP in exchange for a 98-percent limited partnership interest.

4. Investment Advisory Agreement

LVCM, LLC (LVCM), is a Delaware limited liability company whose managing member was Mr. Valdez. LVCM and ICP entered into an investment advisory agreement under which LVCM agreed to provide investment advisory and management services to ICP from May 10, 2001, through December 31, 2015, in exchange for a management fee and an allocation of ICP's profits. The agreement appointed LVCM as ICP's manager, agent, and attorney-in-fact, and the agreement authorized LVCM to bind ICP with respect to, among other things, asset transfers, bank accounts, and transactions.

C. ISP

Limited formed ISP on January 23, 2001, as a Delaware limited liability company. During March 2002, Mr. Hovnanian purchased a 93.9-percent interest in ISP; he did not conduct any due diligence regarding that purchase. ISP's remaining 6.1-

percent interest was owned by ICP and by Mr. Valdez's wholly owned corporation Horizon Capital Holdings Corp. Mr. Valdez controlled ISP at all relevant times.

IV. <u>Mr. Hovnanian and Related Entities</u>

    A. <u>Mr. Hovnanian</u>

Mr. Hovnanian is the managing member of Rovakat and its tax matters partner. He earned a bachelor of science degree in economics from the University of Pennsylvania, and he has over 20 years of experience in the computer, software, and wireless telecommunications industries. He has invested in real estate, startup companies, and financial instruments such as foreign currency contracts, hedging contracts, and the buying and selling of stock (including short selling). He is a wealthy individual, and he is a high-income taxpayer.

    B. <u>VSHG</u>

Mr. Hovnanian was the executive vice president of V.S. Hovnanian Group (VSHG) from June 1980 until January 1991. VSHG was a holding company, and its subsidiaries engaged in construction, development, and utilities. At all relevant times, Mr. Hovnanian owned 25 percent of VSHG, and three members of his family equally owned the remaining 75 percent.

Hovbilt, Inc. (Hovbilt), a C corporation, was one of VSHG's subsidiaries. VSHG owned 99 percent of Hovbilt, and Mr. Hovnanian owned the other 1 percent.

C. Speedus

Speedus Corp. (Speedus) is a publicly traded company that specializes in information technology and medical devices.[5] Since 1991, Mr. Hovnanian has been its president, chief executive officer, and chairman of its board of directors. Mr. Hovnanian also was an employee of Speedus at all relevant times.

V. Jacques Vabre Transactions

Immobiliere and its subsidiaries (collectively, Immobiliere group) owned various assets which had lost much of their value by February 2001. Mr. Valdez and the Immobiliere group discussed Immobiliere's transferring of these distressed assets to entities controlled by Mr. Valdez. Mr. Valdez and the Immobiliere group referred to these transactions as Jacques Vabre transactions, with an understanding that "Jacques Vabre" was Mr. Valdez's nickname.

The Immobiliere group participated in four Jacques Vabre transactions. Each transaction involved the equity interests of a single entity; namely, Credicom Asia, Limited (Credicom Asia), Kislev Partners, L.P. (Kislev Partners), Silvecom S.A., or Todor, S.A. The Immobiliere group earned between $7 million and $10 million in fees by participating in these transactions. The fee for each transaction was set at a percent (ranging from 2 to 2.5

_____

[5]Speedus was formerly known as Suite 12 Group, Highcrest Management, and Cellular Vision. We refer to the precursors of Speedus as Speedus.

percent of 90 percent) of the distressed assets' Federal income tax basis that was claimed to be obtained from the Immobiliere group as part of the transaction.

## VI. Transaction Involving Credicom Asia

### A. Overview

The Jacques Vabre transaction at issue was essentially a four-step transaction involving Credicom Asia. First, Credicom Asia redeemed its worthless class A common stock (class A stock) from CNV for 1,718,116 francs and $303,375. Second, CNV transferred the francs to ICP in exchange for an increased interest in ICP. Third, ICP transferred to Rovakat 50,000 of the francs with an aggregate fair market value of $34,185. Fourth, ICP sold 90 percent of its interest in Rovakat to Mr. Hovnanian. One day after the fourth step, Rovakat sold its 50,000 francs to a third party at their fair market value of $35,268.

### B. History of Credicom Asia

Credicom Asia is a subsidiary of CNV and a member of the Immobiliere group. Credicom Asia was formed as a British Virgin Islands company on June 18, 1992, under the name Pacific Eagle Corporation Limited, and subsequently changed its name to Credicom Asia. On or about September 13, 1996, Credicom Asia was registered to do business in the Cayman Islands. Credicom Asia primarily conducted its activities and maintained its books and records in U.S. dollars.

Credicom Asia had two classes of common stock outstanding as of December 2, 1996. The first class, class A stock, was initially owned entirely by CNV and represented 70 percent of the equity interests in Credicom Asia. The second class, class B common stock (class B stock), was initially owned entirely by Colony Credicom, L.P., and Colorado Credicom, LLC (collectively, C&C), and represented the remaining 30 percent equity interests in Credicom Asia.

C. Liquidation Preference of Credicom Asia

In a Restated Memorandum of Association dated September 13, 1996, Credicom Asia provided that holders of its common stock were entitled to apportion any assets that remained after the preference rights of the preferred shareholders were satisfied as follows:

> First, to the holders of the * * * [class B stock], an amount that would cause [them] to receive an 18% per annum (compounded annually and computed from the date of the issuance thereof) internal rate of return on [their] original principal investment after taking into account * * * all dividends and distributions from [Credicom Asia] in respect of the * * * [class B stock] * * *;
>
> * * * Second, to the holders of the * * * [class A stock], an amount that would cause [them] to receive an 18% per annum (compounded annually and computed from the date of issuance) internal rate of return on [their] original principal investment after taking into account * * * all dividends and distributions from * * * [Credicom Asia] in respect of the * * * [class A stock] * * *;
>
> * * * Third, to the holders of the * * * [class B stock], an amount equal to the product of (A) that

percentage which the * * * [class B stock] represents of all the outstanding common stock, <u>times</u> (B) the ratio of 25/35 <u>times</u> (C) the remaining amount of proceeds to be distributed in respect of a liquidation; and * * *

* * * [Fourth,] * * * the remaining amount to the holders of the * * * [class A stock] * * *.

C&C paid $55 million for the class B stock and as of December 2, 1996, was entitled upon the liquidation of Credicom Asia to a priority distribution of $55 million plus an 18-percent cumulative annual return before any distributions were made to CNV. CNV, the holder of the class A stock, was entitled to receive a portion of the liquidated assets after payment of the priority distribution.[6]

D. <u>Credicom Asia's Holdings</u>

1. <u>Overview</u>

As of January 1, 1997, Credicom Asia's assets consisted of: (1) 100 percent of the stock of Golf de Ramatuelle, S.A. (Golf de Ramatuelle), a French société anonyme; (2) 100 percent of the stock of Lahotel Corporation (Lahotel), a British Virgin Islands company; (3) 91.3 percent of the stock of Argent Holdings, Ltd. (Argent), a British Virgin Islands company; and (4) an unspecified interest in Kislev Partners, a Cayman Islands partnership.

---

[6]On Mar. 26, 2001, Credicom Asia executed a Restated Memorandum of Association, which sought to eliminate the liquidation preference retroactively.

2. <u>Golf de Ramatuelle</u>

As of January 1, 1997, Golf de Ramatuelle was engaged in the attempted development of land (Golf property) in the Commune of Ramatuelle in the Canton of Saint-Tropez, France. Golf de Ramatuelle's principal assets were direct and indirect ownership interests in the Golf property. Golf de Ramatuelle's liabilities totaled $10,524,301 as of December 2, 1996, and approximately $7 million on June 7, 2001.

The Golf property consists of approximately 321 acres of land. The land is principally forest land, with a portion that may be used for agriculture, and is in an area subject to a high risk of fire. The land lacks adequate water, sewer, and power supply to support extensive development. The Golf property was not zoned for commercial development, and Golf de Ramatuelle's attempts to develop the property for nonagricultural uses were unsuccessful throughout the years.

3. <u>Lahotel</u>

As of January 1, 1997, Lahotel owned L'Ermitage Hotel (L'Ermitage), a luxury hotel in Beverly Hills, California. Built in 1976, L'Ermitage was closed for renovations from September 1993 until June 1998. L'Ermitage's liabilities were $9,347,765 as of December 31, 1996. In 1998, L'Ermitage was assessed at $13,185,232 for property tax purposes.

4. Argent

As of January 1, 1997, Argent owned an interest in the Amanresorts hotel chain, through a 60.97-percent interest in Silverlink Holdings, Ltd. (Silverlink). Amanresorts and the nine Aman operating assets, partially or wholly owned by Silverlink, are widely viewed as an innovative upscale hotel group. Aman was recapitalized in 1993 with Immobiliere, through Argent, acquiring control of the company. Silverlink's current liabilities exceeded its current assets on December 31, 1995 and 1996.

5. Kislev Partners

As of January 1, 1997, Kislev Partners, through a wholly owned subsidiary, owned approximately 60 percent of Financiere Saresco (Saresco). Saresco was founded in 1976 by Air France Group and Aeroports de Paris to operate duty-free stores in Paris airports. Saresco, through its various subsidiaries, operated duty-free retail stores which sold perfumes, cosmetics, spirits, tobacco, and fashion accessories. Substantially all of these retail stores sold goods free of duty and of tax. Over 80 percent of the sales in the duty-free division were from Saresco's stores in two terminals in Paris Charles de Gaulle Airport at Roissy.

E.    Buyout of the Class B Stock

By 1998, C&C had become increasingly unhappy with their investment in the class B stock.  On February 15, 1999, C&C petitioned the High Court of Justice, British Virgin Islands, to order the winding up of Credicom Asia.  At that time, Credicom Asia was unable to pay its debts, and C&C owned 36.62 percent of Credicom Asia through ownership of the class B stock and a partial interest in Kislev Partners.  Credicom Asia also owed C&C approximately $22 million.

During August 2000, Immobiliere disposed of substantially all of Saresco's assets in exchange for the cancellation of debt. Shortly thereafter, on September 1, 2000, Credicom Asia, CNV, and C&C entered into a settlement agreement in lieu of the winding up of Credicom Asia.  Under that agreement, C&C granted CNV an option to pay $118 million to acquire the following assets (optioned assets):  (1) 45,834 shares of class B stock owned by C&C; (2) the Kislev partnership interest owned by C&C; (3) debts which Credicom Asia owed to C&C; and (4) a mortgage on Lahotel's assets.  In return, C&C agreed to dismiss the winding up petition upon CNV's exercise of the option.  Mr. Valdez received a copy of this settlement agreement.

CNV exercised its option and purchased the optioned assets on September 18, 2000.  By October 5, 2000, Credicom Asia's

remaining assets were its interests in Golf de Ramatuelle and in Saresco.

Credidev, Ltd. (Credidev), a British Virgin Islands entity, was formed as a wholly owned subsidiary of CNV to receive C&C's class B stock. The class B stock was transferred to Credidev on October 5, 2000. CNV retained its interest in the class A stock.

F.  <u>March 14, 2001, Meeting of the Board of Directors</u>

CNV had no source of revenue other than fees generated from the Jacques Vabre transactions. During a meeting of CNV's board of directors on March 14, 2001, the board of directors "ordered" that CNV reduce its interest in Credicom Asia.

Mr. Van Zeveren, in his capacity as CNV's managing director, worried that CNV's directors could be faulted for failing to call for the cessation of CNV's activities. Specifically, he was concerned that CNV's directors might be reproached because CNV had consistently generated losses since 1991 and all of its fixed assets, with the exception of Golf de Ramatuelle and shares in shell companies, were sold. Mr. Van Zeveren reasoned that CNV's interests in the shell companies had "residual value" in that the companies could generate fees from Mr. Valdez by participating in his transactions. Immobiliere, in its capacity as CNV's majority shareholder, contemplated using any such fees to pay CNV's arrears, to cover its operating expenses for 1 to 2 years, and if necessary, to pay for an amicable liquidation of CNV.

G.  ICM's Purchase of Class A Stock

International Capital Management, LLC (ICM), is a Delaware limited liability company that Mr. Valdez controlled as its managing member.  On March 26, 2001, ICM purchased (1) 1,586.5 shares of class A stock from CNV for $26,503; and (2) 2,291.7 shares of class B stock from Credidev for $38,913.  The purchased class A stock represented a 2-percent interest in Credicom Asia, and the purchased class B stock represented a 5-percent interest in Credicom Asia.

H.  Redemption of Class A Stock

Mr. Valdez was named Credicom Asia's president sometime before June 7, 2001.  On April 25 and May 8, 2001, Mr. Valdez transferred a total of $1,325,126 to a UBS AG (UBS) bank account held by Credicom Asia.  On May 14, 2001, Credicom Asia purchased 1,718,116 francs through its UBS bank account for $1,021,751.  These francs were transferred to a UBS bank account held by CNV.

On June 7, 2001, Credicom Asia redeemed from CNV all of its class A stock for 1,718,116 francs and $303,375.  The redemption was entered into by Mr. Van Zeveren in his capacity as CNV's managing director and by Mr. Valdez in his capacity as Credicom Asia's president.  Also on June 7, 2001, CNV transferred the 1,718,116 francs to ICP in return for an increased limited partnership interest in ICP.

Mr. Valdez wired the $303,375 to CNV from Credicom Asia's UBS bank account. CNV then wired the $303,375 to ICP's UBS bank account. No further activity in Credicom Asia's UBS account occurred until August 24, 2005, when Mr. Valdez closed both the Credicom Asia and ICP UBS bank accounts.

I. Participation Fees

CNV's claimed basis in the class A stock was approximately $184 million, and CNV expected to receive approximately $4,140,000 from Mr. Valdez in exchange for its participation in the Credicom Asia transaction. These fees were payable in two tranches. The first tranche related to $100 million of CNV's claimed basis in the class A stock and generated $2.2 million in fees for CNV.[7] The second tranche related to $84 million of CNV's claimed basis in the class A stock and generated $1,940,000 in fees for CNV. CNV used the fees from the first tranche to purchase bonds issued by Immobiliere in 2001. CNV (or Immobiliere) intended to use the fees generated from the second tranche to pay its arrears, to continue its operations long enough to allow for the sale of CNV's remaining assets, and "to pick the bones clean".

---

[7]Mr. Valdez initially agreed to pay CNV a $2,250,000 fee related to the first tranche. That fee was reduced, however, following Mr. Valdez's agreement to accelerate payments due under the first tranche.

VII.  Francs Transaction

During November 2002, ICP transferred to Rovakat 50,000 francs with a fair market value of $34,185.  Immediately thereafter, Rovakat's owners were ISP (approximately 75-percent owner) and ICP (approximately 25-percent owner).  On December 26, 2002, Mr. Hovnanian purchased 90 percent of ICP's interest in Rovakat for $30,776.  Immediately after, Rovakat's owners (with their approximate ownership interests) were ISP (approximately 75-percent owner), ICP (approximately 2-percent owner), and Mr. Hovnanian (approximately 23-percent owner).

On December 27, 2002, Rovakat sold the 50,000 francs to a third party for $35,468.  Rovakat reported on its 2002 return that its tax basis in the francs was $5,805,000 and that it realized a $5,769,532 loss on the sale ($35,468 - $5,805,000).  Rovakat lacked sufficient income to apply all of the reported loss to 2002, and it reported that it was suspending the unused portion of the reported loss.

VIII.  Payment of Fees to Mr. Valdez

A.  Overview

From 2002 through 2004, Rovakat directly or indirectly paid fees of at least $147,318 to Mr. Valdez.  Rovakat paid these fees through an intermediary entity, Wireless Audience Survey, Inc. (WASI).  Manuel Asensio, a close personal friend and business acquaintance of Mr. Hovnanian, controlled WASI and authorized the

fee payments. WASI, in turn, paid the fees to Mr. Valdez through Limited. Additional fees of $234,835 were paid to another entity controlled by Mr. Valdez.

B. 2002 Payments

Limited issued WASI an October 30, 2002, invoice in the amount of $650,000 for "advisory services in connection with software licensing and code development". Limited received $650,000 from WASI on November 22, 2002.

Rovakat issued Limited a December 26, 2002, invoice in the amount of $593,125 for "consulting" services. One day later, Rovakat issued Limited an invoice in the amount of $593,125 as a "refundable prepaid deposit" for "consulting" services. Limited transferred $593,125 to Rovakat on December 31, 2002.

Rovakat did not report on its 2002 return that any portion of either the $650,000 or the $593,125 was includable in income.

C. 2003 Payments

Limited issued WASI a February 27, 2003, invoice for $1,033,635 of "advisory services in connection with software licensing and code development rendered in 2002". Limited received $1,033,635 from WASI on March 24, 2003.

Rovakat issued Limited a March 25, 2003, invoice for $943,192 of "consulting" services. On March 25, 2003, Limited transferred $943,192 to Rovakat.

Rovakat did not report on its 2003 return that any portion of either the $1,033,635 or the $943,192 was includable in income.

IX.  WIC Lawsuit and Mr. Hovnanian's Bonus

A.  Overview

Speedus filed a lawsuit (WIC lawsuit) against Western International Communications (WIC) on or before April 25, 2002. Speedus agreed in an employment agreement with Mr. Hovnanian to pay him a bonus (bonus) of 20 percent of any net proceeds received by Speedus from the WIC lawsuit.  When that agreement was executed, Mr. Hovnanian was Speedus' chief executive officer, and he was paid in that capacity an annual salary of at least $250,000.  He also was entitled to receive reimbursement for "reasonable business related expenses" incurred as Speedus' chief executive officer.

B.  Mr. Hovnanian Assigns Bonus to Rovakat

On July 10, 2002, Mr. Hovnanian assigned his rights to the bonus to Rovakat.  Mr. Hovnanian did so without receiving a membership interest in Rovakat commensurate with the value of the rights.  The assignment agreement stated that Mr. Hovnanian assigned his rights to the bonus to Rovakat because Rovakat "has members who can confidentially assist and advise the pursuit of the interest in the [WIC lawsuit]."  Under the assignment agreement, Mr. Hovnanian permitted Rovakat to assign the bonus to

subsidiaries or partnerships in which Rovakat held a majority interest.

C. Settlement of WIC Lawsuit

In late 2003 or early 2004, Speedus and WIC settled the WIC lawsuit for $15 million. Of that amount, Speedus was entitled to receive $14,232,280 in net proceeds. Speedus was amenable to paying the $2,846,456 bonus (20 percent x $14,232,280) to Mr. Hovnanian as he directed.

D. Sunshower

Mr. Hovnanian, on behalf of Rovakat, formed Sunshower LLC (Sunshower) as a Delaware limited liability company on February 4, 2004. Sunshower is a disregarded entity for Federal income tax purposes. On February 20, 2004, Speedus transferred $2,846,456 to Sunshower's bank account. In correspondence with Rovakat's accountant, Mr. Hovnanian designated these proceeds as "consulting income".

On February 27, 2004, Mr. Hovnanian caused $234,835 to be transferred from Sunshower to Sterling Capital Management, Ltd. (Sterling), an entity controlled by Mr. Valdez. Mr. Hovnanian noted that this payment represented "fees paid to * * * [Mr. Valdez's] entity". Speedus did not reimburse Mr. Hovnanian for the $234,835 paid to Mr. Valdez.

X.  Similar Transactions in Which Mr. Hovnanian Participated

Mr. Hovnanian participated in two additional transactions involving purportedly high-basis francs and the reporting of ordinary losses.  The first transaction involved the transfer of francs with a fair market value of approximately $60,000 and a purported basis of $11,698,313.  Hovbilt used the resulting claimed loss to offset income that VSHG earned.  The second transaction involved the transfer of francs with a fair market value of approximately $59,920 and a purported basis of $11,847,499.  ISP used the resulting claimed loss to offset income that Mr. Hovnanian earned from unrelated sources.

XI.  Rovakat's Federal Partnership Tax Returns

A.  Preparer of the Returns

Harvey Weinreb (Mr. Weinreb) prepared Rovakat's 2002, 2003, and 2004 returns.  Mr. Hovnanian retained Mr. Weinreb for that purpose at the suggestion of Mr. Valdez.

B.  2002 Return

Rovakat filed its 2002 return on October 23, 2003.  The 2002 return reported no gross receipts and no income.  Rovakat reported that it was entitled to recognize $130,766 as a loss on the francs transaction and that another $5,638,765 from the transaction was a "suspended loss".

C.  2003 Return

Rovakat filed its 2003 return on April 7, 2005.  The 2003 return reported no gross receipts, no ordinary business income or loss, and "other fees income" of $943,192.  Rovakat recognized $890,485 of the suspended loss and reported that $4,335,154 remained "suspended".[8]  Rovakat also reported a charitable contribution deduction of $6,224.

D.  2004 Return

Rovakat filed the 2004 return on February 13, 2006.  The 2004 return reported total income of $2,846,456, which apparently was the bonus from Speedus.  Rovakat recognized $2,479,991 of the suspended loss as a "prior year suspended loss" and reported that $1,855,163 remained "suspended".  Rovakat also reported a charitable contribution deduction of $60,350.

E.  Expenses Reported on 2003 and 2004 Returns

Rovakat reported the following expenses as deductions on its 2003 and 2004 returns:

| Expense | 2003 | 2004 |
| --- | --- | --- |
| Bank fee | $332 | -0- |
| Consulting | 22,000 | $56,154 |
| Filing fees | 546 | 2,418 |
| Finance charge | 58 | -0- |
| Office | 861 | -0- |
| Postage and delivery | 14 | -0- |

---

[8]The amount of the remaining "suspended loss" appears to have been reported incorrectly ($5,769,532 claimed loss - $130,766 loss reported on the 2002 return - $890,485 loss reported on the 2003 return = $4,748,281).

| | | |
|---|---|---|
| Professional fees | 13,000 | -0- |
| Legal and accounting fees | -0- | 250,410 |
| Miscellaneous | -0- | 65 |
| Auto | 7,659 | 1,408 |
| Computer | 198 | -0- |
| Meal and entertainment | 19,296 | 42,208 |
| Total | 63,964 | 352,663 |

## XII.  Tax Advice and Opinions

### A.  KPMG Facsimile

On March 1, 2001, KPMG sent to Mr. Van Zeveren a one-page facsimile which stated that the "evolution of the purchase value" of the class A stock as recorded in CNV's books was $184,955,349. KPMG apparently did not attach the source documents for this conclusion to its facsimile, and the memorandum does not define "purchase value".

### B.  Sidley Austin Opinion

Before July 31, 2001, Mr. Valdez hired Sidley, Austin, Brown, and Wood LLP (Sidley Austin) to render an opinion (Sidley Austin opinion) for Federal tax purposes on the bases of various assets transferred in connection with Credicom Asia's redemption of its class A stock.  In rendering its opinion, Sidley Austin reportedly "relied on audited financial statements, accounting records, third party appraisals, and certain other factual, financial, and numerical information that * * * [it] deemed relevant."  In addition, the Sidley Austin opinion noted that Sidley Austin relied on at least 25 assumptions and 13 factual representations.

The Sidley Austin opinion concluded that (1) the basis of CNV's interest in the class A stock as of June 7, 2001, was $207,093,834; (2) CNV's basis in the 1,718,116 francs and the $303,375 received from the redemption of the class A stock totaled $207,093,834; (3) the basis of CNV's interest in ICP as of June 8, 2001, was $207,093,834; and (4) ICP's basis in the 1,718,116 francs which ICP received from CNV was $206,790,459. Mr. Hovnanian first received a copy of the Sidley Austin opinion in 2008.

C. De Castro Opinions

Mr. Hovnanian, at the suggestion of Mr. Valdez, hired the law firm of De Castro, West, Chodorow, Glickfield & Nass, Inc. (De Castro), to render a tax opinion regarding the tax consequences of the francs transactions (Rovakat opinion). The cost of the Rovakat opinion was $13,000. Mr. Hovnanian relied on Mr. Valdez to serve as an intermediary between Mr. Hovnanian and De Castro. The Rovakat opinion concluded that "there is a greater than 50% likelihood that the tax treatment of the * * * [francs transaction] would be upheld if challenged by the IRS." In rendering that opinion, De Castro "assumed * * * the accuracy of the factual matters" represented in the Sidley Austin opinion, including ICP's basis in the francs, and did not review "any transactional documents".

Mr. Hovnanian also procured an opinion from De Castro on the tax consequences associated with ISP's investment in francs (ISP opinion). The Rovakat and ISP opinions are identical in most material regards.

In total, De Castro wrote nine opinions for Mr. Valdez and for individuals who invested in his transactions. De Castro made thousands of dollars on referrals from Mr. Valdez and at least $2 million from writing opinions on other similar transactions. Menasche Nass, a partner of De Castro, invested in a "distressed debt transaction".

## XIII. FPAAs

On November 13, 2008, respondent issued to Rovakat a separate notice of final partnership administrative adjustment (FPAA) for each of Rovakat's 2002, 2003, and 2004 taxable years. The FPAAs determined that Rovakat had not established its basis in the francs. The FPAAs determined alternatively that the francs transaction lacked economic substance.

## XIV. Trial of This Case

### A. Overview

A trial was held in New York, New York, from December 14 through December 17, 2010. The evidence consists of the uncontested pleadings, the trial testimony of 7 lay and 3 expert witnesses, over 700 stipulated facts, and over 600 exhibits.

B.  Expert Witnesses

1.  Dr. LaRue

Respondent offered, and the Court recognized, David W. LaRue, Ph.D. (Dr. LaRue), as an expert in financial and tax accounting, finance, and economics.  Dr. LaRue is a professor emeritus at the University of Virginia, and he holds a Ph.D. in accounting, taxation, and economics and a master's degree in accounting and taxation.  From 2000 through 2005 he was the director of the graduate accounting program at the University of Virginia.  He has over 30 years of teaching experience in the fields of taxation, accounting, and finance.  He has testified before this and other Courts on many previous occasions as an expert in financial and tax accounting, finance, and/or economics.

2.  Dr. Friedman

Respondent offered, and the Court recognized, Jack P. Friedman, Ph.D. (Dr. Friedman), as an expert on fair market value as it relates to real estate and business valuation.  Dr. Friedman holds a Ph.D. in business administration with a focus in real estate and urban affairs, a master's degree in business administration, and a bachelor's degree in business administration.  Dr. Friedman is published and holds the following professional certifications:  Certified public accountant (C.P.A.), member of the Appraisal Institute, senior

real estate analyst, senior member of the American Society of Appraisers, and fellow of the Royal Institute of Chartered Surveyors. Dr. Friedman has taught real estate appraisal courses for 19 years, and he has developed courses for various professional associations.

### 3. Mr. Bernatowicz

Mr. Hovnanian called Frank A. Bernatowicz (Mr. Bernatowicz) as his expert, and the Court recognized Mr. Bernatowicz as an expert in financial accounting. Mr. Bernatowicz is a C.P.A. and a member of the American Institute of C.P.A.s, the Illinois C.P.A. Society, and the National Society of Professional Engineers. He holds a bachelor of science degree in electrical engineering and a master's degree in business administration in finance. He was a partner with Ernst and Whinney (now Ernst and Young), and he directed the firm's Midwest Region Litigation Services and Real Estate Advisory Services practices. He was a managing principal of Alix & Associate's Chicago office, a managing partner of the Midwest Region Intellectual Property Practice of PricewaterhouseCoopers LLP, and a managing partner of BDO Seidman's Specialized Services practice.

### C. Special Procedure as to Expert Testimony

With the agreement of the parties, we directed the experts to testify concurrently. To implement the concurrent testimony, the Court sat at a large table in the middle of the courtroom

with all three experts, each of whom was under oath.  The parties' counsel sat a few feet away.  The Court then engaged the experts in a three-way conversation about ultimate issues of fact.  Counsel could, but did not, object to any of the experts' testimony.  When necessary, the Court directed the discussion and focused on matters that the Court considered important to resolve.  By engaging in this conversational testimony, the experts were able and allowed to speak to each other, to ask questions, and to probe weaknesses in any other expert's testimony.  The discussion that followed was highly focused, highly structured, and directed by the Court.[9]

OPINION

## I.  Burden of Proof

Taxpayers generally bear the burden of proof in a partnership-level proceeding such as this, see Rule 142(a), and Mr. Hovnanian concedes that this general rule applies with respect to the adjustments in the FPAAs.  Respondent bears the burden of proving the allegation in his amendment to answer that Rovakat earned unreported income of $650,000 in 2002.  See id.

---

[9]The U.S. District Court for the District of Massachusetts has apparently used concurrent witness testimony in a number of nonjury cases in recent years.  See Wood, "Experts in the Tub", 21 Antitrust 95, 97 (2007).

II.  Rovakat's Claimed Loss

    A.  Overview

    We first decide whether Rovakat may recognize its claimed losses of $130,766 for 2002, $890,485 for 2003, and $2,479,991 for 2004.  Mr. Hovnanian contends that these losses are allowed on account of Rovakat's sale of the francs.  As Mr. Hovnanian sees it, CNV was a partnership that had a $182,068,631 basis in its class A stock (which Mr. Hovnanian considers to be a partnership interest), and that basis was transferred to the 1,781,116 francs that CNV received upon the redemption of the class A stock.  Then, Mr. Hovnanian reasons, ICP received that basis upon its receipt of the francs, and Rovakat received a pro rata share of the basis upon Rovakat's receipt of 50,000 of the francs.  Mr. Hovnanian concludes that Rovakat's sale of the 50,000 francs on December 27, 2002, triggered the basis, which in turn resulted in an approximately $5 million loss allocable to its partners (principally, Mr. Hovnanian).

    Respondent argues that Rovakat may not recognize its claimed losses because Mr. Hovnanian has failed to establish Rovakat's basis in the francs.  In addition, respondent argues, Rovakat may not recognize its claimed losses because the transfers of the francs lacked economic substance in that the francs transaction was effected solely to generate an artificial loss.

We agree with respondent that Rovakat may not recognize its claimed losses. As we find, Mr. Valdez orchestrated a series of transactions through which CNV, a corporation, sold its built-in loss in its class A stock to either Mr. Valdez or to ICP, and the transactions resulting in that sale were intended solely to disguise the sale as a tax loss that could ultimately shelter Mr. Hovnanian's ordinary income from U.S. taxes.

B. Basis in the Francs

Mr. Hovnanian bears the burden of establishing Rovakat's basis in the francs, and that burden includes establishing ICP's basis in the francs upon their transfer. Mr. Hovnanian strives to meet this burden by focusing on the general rules of partnership taxation. Under those rules, which apply even where the contributor is a foreign entity, see Gutwirth v. Commissioner, 40 T.C. 666, 678-679 (1963), a partner's contribution of property to a partnership in exchange for a partnership interest is generally a tax-free transaction, see sec. 721(a). In addition, the partner's basis in the partnership interest received generally equals the partner's adjusted basis in the contributed property plus, where applicable, the amount of any money the partner also contributed. Sec. 722. In addition, the partnership's basis in the contributed property generally is a substitute basis that equals the partner's adjusted basis in that property at the time of contribution. Sec. 723.

These general rules do not apply, however, where, as here, the facts establish that one or more of the relevant transactions is not in substance a contribution to a partnership as it purports to be. The substance of the transactions at hand, as we find on the basis of the credible evidence in the record, is that Mr. Valdez, in his individual capacity or on behalf of ICP, bought the class A stock from CNV, a corporation, at an amount drastically in excess of the stock's fair market value, and he did so with an understanding that CNV would cooperate in structuring the sale to appear to be a nontaxable transfer. For obvious reasons, the parties to the agreement could not memorialize in the transaction documents the true terms of the transaction as a sale because a sale would negate any claims of a substitute basis in the francs under the partnership rules applicable to contributions of property. When viewed in total, however, the record leads us to conclude that either Mr. Valdez engaged in an actual purchase of the class A stock or ICP engaged in a disguised purchase of the class A stock, which in either case sets the basis in the francs at their cost. See sec. 1012; see also sec. 1.707-3(a)(2), Income Tax Regs.

To be sure, Mr. Valdez structured the transactions using entities he controlled, aiming to manipulate the rules applicable to partnership taxation so that he could sell to his U.S. "investors" foreign built-in losses that they could personally

apply as ordinary losses.  He provided the money for the class A stock to be "redeemed".  He converted the stock to francs so he could use a currency which was CNV's nonfunctional currency.  He caused CNV to transfer the francs to ICP, an entity he controlled and which he claimed was a partnership, so he could claim a substitute basis in the francs.  The fact that Mr. Valdez wanted directly or indirectly to purchase the class A stock with its built-in loss retained for use by Mr. Hovnanian cannot reasonably be denied.

Nor has Mr. Hovnanian established (as he asserts) that ICP was a partnership entitled to a substitute basis in the francs. A partnership exists for Federal income tax purposes only when "persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." Commissioner v. Tower, 327 U.S. 280, 286 (1946).  Facts relevant to this determination include the conduct of the parties, particularly their due diligence (or lack thereof) and negotiations (or lack thereof), the relationship of the parties, and the control of income and the purposes for which it is used. See Commissioner v. Culbertson, 337 U.S. 733, 742 (1949).  The absence of a nontax business purpose is fatal to the validity of a partnership.  See ASA Investerings Pship. v. Commissioner, 201 F.3d 505, 512-513 (D.C. Cir. 2000), affg. T.C. Memo. 1998-305.

The record does not suggest, and we do not find, that ICP's listed partners intended to join together to carry on a trade or business. The record does not establish the intent of each of ICP's "partners", but we find as to Mr. Valdez and CNV, ICP's primary "partners", that they had their own agendas. CNV was in financial trouble, and it and Immobiliere desired to obtain liquidity primarily by selling alleged tax basis in what was otherwise a worthless shell entity, Credicom Asia. CNV's and Immobiliere's due diligence was focused on how many Jacques Vabre transactions could be put together with Mr. Valdez and how fast payment could be made. CNV and Immobiliere expected to be paid approximately $4 million for their part, far in excess of the approximately $1.3 million actually exchanged for the redemption of the class A stock. Because Mr. Hovnanian has failed to prove that ICP was a partnership for Federal income tax purposes (and the record establishes that it was not), ICP had a cost basis in the francs, see sec. 1012, rather than the substitute basis that Rovakat reported.[10]

---

[10]Nor does the record establish, as Mr. Hovnanian asserts, that Credicom Asia was a partnership. Credicom Asia had two classes of common stock, and its ownership was represented by "shares" owned by "shareholders". The record also lacks a partnership agreement entered into between the purported partners of Credicom Asia. While the Sidley Austin opinion states that Credicom Asia amended its articles to reflect the characteristics of a partnership on Dec. 2, 1996, that statement is unsupported by the record. In addition to our discussion set forth above in this footnote, Credicom Asia did not file a Form 1065 until 2001,

(continued...)

C.  Economic Substance

1.  Guiding Legal Principles

Mr. Hovnanian stated at trial that an appeal in this case would lie in the Court of Appeals for the Third Circuit, and respondent agreed.  In ACM Pship. v. Commissioner, 157 F.3d 231, 247-248 (3d Cir. 1998), affg. in part and revg. in part on an issue not relevant here T.C. Memo. 1997-115, the Court of Appeals for the Third Circuit articulated a two-factor inquiry to decide whether a transaction or series of transactions had sufficient economic substance to be respected for Federal tax purposes.[11] The first factor requires an objective inquiry as to whether the transaction had practical economic effect apart from tax savings. The second factor requires a subjective inquiry into whether the taxpayer participated in the transaction for a valid nontax business purpose.  See id.  These factors are interrelated and

[10](...continued)
and we do not find that any of Credicom Asia's shareholders as of the time of the stated conversion reported the deemed liquidation and distribution that would have occurred on such a conversion. See sec. 301.7701-3(g)(1)(ii), Proced. & Admin. Regs.; see also Rev. Rul. 63-107, 1963-1 C.B. 71.

[11]Congress codified the economic substance doctrine mostly as articulated by the Court of Appeals for the Third Circuit in ACM Pship. v. Commissioner, 157 F.3d 231, 247-248 (3d Cir. 1998), affg. in part and revg. in part on an issue not relevant here T.C. Memo. 1997-115.  See sec. 7701(o), as added to the Code by the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, sec. 1409, 124 Stat. 1067; see also H. Rept. 111-443 (I), at 291-299 (2010) (discussing the reasons for codification of the economic substance doctrine).  This codified doctrine does not apply to this case pursuant to its effective date.

are not simply "discrete prongs of a 'rigid two-step analysis.'" Id. at 247 (quoting Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. Sturm v. Commissioner, T.C. Memo. 1987-625).  In applying these factors, all stages of the transaction must be scrutinized to determine whether the taxpayer's beneficial interest was affected in a meaningful nontax way. Knetsch v. United States, 364 U.S. 361, 366 (1960).

### 2.  Objective Inquiry

#### a.  Overview

We first examine whether the francs transaction had practical economic effect other than the creation of a tax loss. We conclude it did not.  When viewed according to their objective economic effect, Credicom Asia's redemption of the class A stock from CNV partially for francs, CNV's transfer of the francs to ICP, ICP's transfer of a portion of the francs to Rovakat, CNV's sale of 90 percent of its interest in Rovakat to Mr. Hovnanian, and Rovakat's sale of the francs were, economically speaking, negligible events.  The francs transaction as a whole, when viewed in the light of its individual steps, had no economic significance other than to serve as a means for Mr. Hovnanian's attempt to purchase and use CNV's built-in loss.  The following factors further support our conclusion that the objective economic effect of the francs transaction is not consistent with Rovakat's reporting of that transaction.

b. Lack of Pretax Profit Potential

In general, a transaction has economic substance and will be respected for Federal tax purposes where the transaction offers a reasonable opportunity for profit independent of tax savings. Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). A reasonable opportunity for profit will ordinarily be found only if there was a legitimate expectation that the nontax benefits would be at least commensurate with the associated transaction costs. ACM Pship. v. Commissioner, T.C. Memo. 1997-115; see also Salina Pship. L.P. v. Commissioner, T.C. Memo. 2000-352. Deliberately incurring expenses in excess of appreciable gain is "the antithesis of profit-motivated behavior". Yosha v. Commissioner, 861 F.2d 494, 498 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986).

The francs transaction did not present Rovakat with a reasonable opportunity for profit independent of tax savings. Rovakat incurred at least $395,153 in transaction costs related to the francs transaction. These costs included at least $382,153 in fees paid to Mr. Valdez and $13,000 paid to De Castro for the Rovakat opinion.[12] The sole economic gain that Rovakat could realize on the francs transaction was attributable to exchange rate fluctuations between the franc and the U.S. dollar.

_____

[12]The $382,153 consists of the $56,875 and $90,443 that Rovakat paid in 2002 and 2003, respectively, and the $234,835 that Sunshower paid to Mr. Valdez.

Dr. LaRue reviewed the franc to U.S. dollar exchange rates from January 1, 1990, to December 30, 2006. During that time, the relationship between the franc and the U.S. dollar was relatively stable, and the buy-side market for francs was highly liquid with minimal transaction costs. Dr. LaRue concluded that the franc to U.S. dollar exchange rates were not sufficient to yield a positive pretax return and that the value of the U.S. dollar against a franc would have had to increase by more than 157 percent before Mr. Hovnanian realized his first nominal dollar of pretax profit.[13] Dr. LaRue concluded that even if the franc became worthless, Mr. Hovnanian would have experienced a positive aftertax return in excess of 9,380 percent, notwithstanding the corresponding loss of his initial investment in francs. When Credicom Asia redeemed its class A stock, the claimed tax basis in the francs ultimately transferred to ICP was over 200 times greater than their fair market value. If the value of the francs doubled during Mr. Hovnanian's holding period, the potential Federal income tax savings, assuming a tax rate of 39.1 percent, would exceed the pretax economic gain by approximately 80 times.

We credit Dr. LaRue's testimony and conclude that a rational investor would have recognized the nonexistence of a realistic

---

[13]A nominal dollar is the value of a dollar in the future that is not discounted to take into account the time-value-of-money, risk, or other similar costs of capital.

probability that the francs which Rovakat held would have sufficiently appreciated to produce a pretax profit.  This lack of pretax profit potential weighs heavily against a finding that the francs transaction was economically significant.[14]  Accord Gilman v. Commissioner, T.C. Memo. 1989-684 (sale-leaseback transaction lacked economic substance where, when the transaction was entered into, a prudent investor would have concluded that there was no chance to earn a nontax profit in excess of transaction costs), affd. 933 F.2d 143 (2d Cir. 1991).

### c.  Actual Economic Effect

Tax losses which fail to "correspond to any actual economic losses, do not constitute the type of bona fide losses that are deductible" for Federal tax purposes.  ACM Pship. v. Commissioner, 157 F.3d at 252 (internal citations omitted).  The economics of the francs transaction do not support Rovakat's claim to the losses reported on its 2002 through 2004 returns.  Upon the sale of the francs, Rovakat did not realize a $5,769,532

---

[14]Mr. Hovnanian presented no expert testimony on the pretax profit potential associated with Rovakat's investment in the francs transaction.  Rather, he contends that the fees which Rovakat paid to Mr. Valdez were "collection fees" unrelated to the structuring of the francs transaction.  We find to the contrary.  Even if they were collection fees, however, Rovakat still could not have reasonably expected a pretax profit on the francs transaction.  The $13,000 fee paid to De Castro for the Rovakat opinion alone consumed any profit to be realized on the francs transaction.

economic loss; it realized a $1,283 economic gain.[15] While realization of an economic gain may suggest that a transaction has economic substance, the prospect of a nominal, incidental pretax profit does not necessarily establish that a transaction was designed to serve a nontax profit motive. Id. at 258; Sheldon v. Commissioner, 94 T.C. 738, 768 (1990). Moreover, as to the francs transaction, any profitability on the transaction was subsumed by the costs of entering into the transaction.[16]

### d. Francs Paid in Redemption

We are similarly not persuaded that Credicom Asia's partial redemption of its class A stock with francs had practical economic effect apart from tax savings. The functional currency of Credicom Asia was the U.S. dollar, and the functional currency of CNV was the Belgian franc. One might reasonably expect that the redemption would have been effected with the functional currency of one of the parties to the redemption and not the nonfunctional franc. While the form of consideration might, at first blush, appear to be insignificant, the tax benefit to

[15]Rovakat's $1,283 economic gain equals $35,468 (amount Rovakat realized when it sold the francs) minus $34,185 (fair market value of francs when Rovakat received them).

[16]Equally compelling is our finding that the event giving rise to Rovakat's claimed high basis in the francs was CNV's failed investment in Credicom Asia, as opposed to an economic outlay made by Rovakat. Dr. Friedman opined that the class A stock was worthless at and before the time of its redemption. We consider that opinion to be reasonable and reliable, and we accept it.

Rovakat's members by structuring the transaction with francs was potentially tremendous.

Gains or losses attributable to a section 988 transaction are generally treated as ordinary income or ordinary losses. Sec. 988(a)(1). A disposition of property is usually considered to be a section 988 transaction where the property is a nonfunctional currency; i.e., a currency other than (1) the U.S. dollar or (2) in certain cases, the currency of the economic environment in which a significant part of an activity is conducted and which is used in the books and records of that activity. See sec. 1.988-1, Income Tax Regs.; see also secs. 985(b)(1), 989(a).

If, as Mr. Hovnanian asserts, Rovakat acquired the francs as part of an investment activity entered into for the production of income, the francs would be a nonfunctional currency to Rovakat, and Rovakat's disposition of the francs would result in ordinary income or ordinary loss. See sec. 988(a)(1), (c)(1). If, however, Credicom Asia had redeemed its class A stock in U.S. dollars and the contributions from CNV to ICP to Rovakat were denominated in U.S. dollars, any gain or loss on Rovakat's disposition of the U.S. dollars would be taxed as a capital gain or a capital loss. See Ark. Best Corp. v. Commissioner, 485 U.S. 212, 213 (1988); see also sec. 1221(a). Thus, by using francs in partial satisfaction of the redemption, Mr. Valdez aimed to

convert capital losses into ordinary losses that could offset ordinary income such as salaries and wages.  For a high-income taxpayer such as Mr. Hovnanian expecting to receive a significant amount of ordinary income for his role in the WIC lawsuit, these tax savings were substantial.  Mr. Hovnanian has offered no valid business reason why Credicom Asia would partially redeem its class A stock with francs but for the prospect of converting the character of the purported resulting loss from capital to ordinary.

### e.  Rovakat's Sale of the Francs

Nor do we find that there was a valid business reason for Rovakat's sale of the francs just 1 day after Mr. Hovnanian purchased 90 percent of ICP's interest in Rovakat.  Mr. Hovnanian asserts that the sale of the francs was necessary for Rovakat to generate working capital.  We are not persuaded.  As of December 27, 2002, Rovakat had $100,000 in its checking account and had invoiced Limited for $593,125 from "consulting" services.  Mr. Hovnanian fails to adequately explain why its proffered need for Rovakat to have working capital was not met by these funds. Rovakat's decision to exit the francs transaction literally overnight is especially telling because Rovakat's sale of the francs served as the triggering mechanism by which Mr. Hovnanian would purportedly be able to personally claim his portion of that

loss for Federal income tax purposes.  See <u>Santa Monica Pictures,
LLC v. Commissioner</u>, T.C. Memo. 2005-104.

### f.  <u>Fees Paid to the Immobiliere Group</u>

Mr. Valdez's payment of over $4 million in fees to the
Immobiliere group in exchange for CNV's participation in the
francs transaction also suggests that the francs transaction
lacked economic substance.  These fees were not standard
financing fees but were based upon the amount of tax basis which
ICP expected to receive.  Mr. Hovnanian has not explained why a
fee due to a foreign company would depend upon the basis of
property for Federal tax purposes.  The payment of fees
contingent upon the tax basis which could be realized for Federal
tax purposes suggests that tax-motivated considerations were the
principal reason for the francs transaction.  See <u>Kerman v.
Commissioner</u>, T.C. Memo. 2011-54.

### g.  <u>Summary of Objective Economic Effect</u>

We conclude that the first factor of the economic substance
inquiry weighs heavily against a finding that the francs
transaction was "compelled or encouraged by business or
regulatory realities, * * * imbued with tax-independent
considerations, and * * * not shaped solely by tax-avoidance
features".  <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 583-
584 (1978).  Rovakat effectively spent over $382,000 to produce
an economic gain of less than $1,300 and a reportable tax loss in

excess of $5 million.  Rovakat's reporting of the losses reflects neither the economic realities of the gain which Rovakat realized, nor that the actual economic loss was borne by CNV. The use of francs to partially redeem Credicom Asia's shares served the seemingly limited purpose of converting the character of the loss from capital to ordinary.  Rovakat joined ICP so as to effect a disposition of the francs and have those losses allocated to Mr. Hovnanian.

### 3.  Subjective Business Purpose

#### a.  Overview

The second factor of the economic substance inquiry requires that we examine the taxpayer's subjective nontax reasons for entering into a transaction and whether the taxpayer held a legitimate profit motive for doing so.  Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 92 (4th Cir. 1985)), affg. in part and revg. in part 81 T.C. 184 (1983).  Whether a transaction is conducted with a subjective business purpose depends on a number of subfactors, including whether:  (1) The taxpayer had a valid nontax business purpose for entering into the transaction, see Casebeer v. Commissioner, 909 F.2d at 1363-1364; (2) the transaction was negotiated and entered into at arm's length, see Helba v. Commissioner, 87 T.C. 983, 1004-1007 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); (3) the taxpayer performed due diligence regarding the commercial

viability and market risks of the transaction, see Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989), affg. 88 T.C. 386 (1987); (4) in the case of a partnership, the partners intended to join together for the present conduct of an undertaking or enterprise, see Culbertson v. Commissioner, 337 U.S. at 742; and (5) the transaction was marketed as a tax shelter in which the purported tax benefit significantly exceeded the taxpayer's actual investment, see Booker v. Commissioner, T.C. Memo. 1996-261. These subfactors are not exclusive, and no one subfactor is dispositive. We analyze the subfactors seriatim.

### b. Rovakat's Business Purpose

Mr. Hovnanian has failed to establish that the francs transaction served any legitimate business purpose, and we conclude that none existed. He asserts that the contribution of francs to Rovakat and Rovakat's subsequent sale of the francs were intended to serve as seed money to fund Rovakat's development of a competitor to the Nielsen television rating service (Nielsen). We are unpersuaded.

Early in 2001, Mr. Hovnanian introduced Dish and EchoStar (collectively, EchoStar) to the concept of establishing EchoStar as a competitor to Nielsen. EchoStar committed support of up to $15 million to a project to carry out this concept, though the record is not clear whether Mr. Hovnanian or Rovakat actually

received these funds.  Mr. Hovnanian testified that he engaged Mr. Valdez to form Rovakat as part of the project because, among other things, Mr. Valdez had access to investors with the capital to fund such a venture.  The Nielsen-competitor project ultimately failed.

Mr. Hovnanian's testimony misses the point.  We focus on the business purpose of the francs transaction and not any business venture which Mr. Hovnanian may have pursued before Rovakat's formation.  The record does not establish that Rovakat had an ongoing business after the Nielsen-competitor project failed, nor when that project failed.  Mr. Hovnanian could have called witnesses from EchoStar to testify on this point, but he declined to do so.[17]

Mr. Hovnanian also asserts that the francs transaction enabled him to establish and cultivate ties with Mr. Valdez and with the Belgian entities, apart from any possible tax considerations.  We are not persuaded.  The Credicom Asia redemption, CNV's contribution of the francs to ICP, and the payment of fees from ICP to Immobiliere occurred between Mr.

---

[17]At trial, Mr. Hovnanian attempted to introduce, and the Court declined to admit, an affidavit from an EchoStar executive in lieu of that executive's direct testimony.  We found the affidavit to be inadmissible hearsay not excepted by Fed. R. Evid. 807.  See Saavedra v. Commissioner, T.C. Memo. 1988-587 (declining to admit an affidavit where the taxpayer did not demonstrate "reasonable efforts to obtain the witness' personal testimony"); see also Rule 143(b).

Valdez and members of the Immobiliere group.  Any goodwill which may have been gained from these transactions was to the benefit of Mr. Valdez and not Mr. Hovnanian.

### c.  Lack of Arm's-Length Dealing

In determining whether a transaction possesses objective indicia of economic substance, we examine whether the transaction was conducted at arm's length.  Helba v. Commissioner, supra at 1005.  Where a transaction occurs between related parties, the transaction is carefully scrutinized "'because the control element suggests the opportunity to contrive a fictional * * * [transaction].'"  Geftman v. Commissioner, 154 F.3d 61, 68 (3d Cir. 1998) (quoting United States v. Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976)), revg. in part and vacating in part T.C. Memo. 1996-447; see also Schering-Plough Corp. v. United States, 651 F. Supp. 2d 219, 244 (D.N.J. 2009), affd. sub nom. Merck & Co. v. United States, __ F.3d __ (3d Cir., June 20, 2011).

We find a lack of arm's-length dealing with respect to the francs transaction.  Mr. Valdez controlled each aspect of that transaction up until the sale of ICP's interest in Rovakat to Mr. Hovnanian.  By June 7, 2001, Mr. Valdez was Credicom Asia's president, and he caused the redemption of the class A shares with francs and with U.S. dollars.  He controlled the bank accounts of Credicom Asia and of ICP.  He effected the transfer

of funds between Credicom Asia, CNV, and ICP.  He controlled ICP, and he managed LVCM.

In addition, Mr. Valdez continued to influence the outcome of the francs transaction even after ICP sold 90 percent of its interest in Rovakat to Mr. Hovnanian.  Mr. Valdez suggested that Mr. Hovnanian engage Mr. Weinreb to prepare Rovakat's 2002 through 2004 returns.  Mr. Valdez recommended that Mr. Hovnanian engage De Castro to provide tax advice regarding the francs transaction.  Rovakat's procurement of tax advice was more reflective of a symbiotic relationship between De Castro and Mr. Valdez rather than of independent counseling on the merits of the francs transaction.

### d.  Lack of Due Diligence

Mr. Hovnanian presented no documentary evidence to suggest that he undertook a critical nontax economic analysis of the risks associated with investing in francs.[18]  The De Castro opinion focuses only on the tax effect of the francs transaction without regard to the commercial viability or market risk associated with that transaction.  Such a lack of due diligence on the part of Mr. Hovnanian suggests that he was not concerned with the economic realities of the francs transaction or with

---

[18]The absence of such evidence creates a presumption that no such documents existed or that they were not favorable to Mr. Hovnanian's position.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

elements of risk.  Cf. <u>Salina Pship. L.P. v. Commissioner</u>, T.C. Memo. 2000-352 (finding indicia of economic substance where a partnership held two meetings with the investment banker who structured a transaction in which the partnership invested and was presented with several analyses of the financial risks and rewards associated with such an investment).  Mr. Hovnanian's lack of concern for the underlying economics of the francs transaction is not consistent with a genuine nontax profit motive.

### e.  <u>Lack of Mutuality of Profit Objective</u>

We also examine the surrounding facts and circumstances to determine whether any of the relevant persons, in good faith, intended to join together for the present conduct of an undertaking or enterprise.  <u>TFID III-E, Inc. v. United States</u>, 459 F.3d 220, 231-232 (2d Cir. 2006); see also <u>Commissioner v. Culbertson</u>, 337 U.S. at 742.  We find that the francs transaction lacks mutuality of profit objective.

CNV was motivated to enter into the francs transaction to realize whatever fees it could from its failed investment in Credicom Asia.  The payment of these fees allowed CNV to pay its arrears and to continue its operations long enough to allow for the sale of CNV's remaining asset, an interest in Golf de Ramatuelle.  While these goals might be valid business reasons for CNV's redemption of its class A stock, they bear no apparent

relation to CNV's, ICP's, or Rovakat's business purpose for entering into the francs transaction. The fees due to CNV were contingent on the tax basis in the francs for Federal tax purposes. Such a framework suggests that ICP was motivated by CNV's tax attributes and not by an independent economic significance of the francs.

Mutuality of profit objective also is lacking between ICP and Rovakat. ICP's transfer of 50,000 francs and ISP's transfer of $100,000 served the seemingly limited purpose of enabling ICP to become a temporary partner of Rovakat and to transfer the purportedly high-basis francs to Rovakat to trigger the intended tax loss. Mr. Hovnanian did not desire to invest in francs, and those francs were sold just 1 day after Mr. Hovnanian acquired ICP's 90-percent interest in Rovakat. The occurrence of these steps within such a short time suggests that the disposition of the francs was predetermined.

### f. Other Distressed Asset Transactions

Mr. Hovnanian, acting in a capacity as other than Rovakat's tax matters partner, invested in at least two other transactions similar to the francs transaction. The resulting claimed losses from those transactions were used to offset unrelated income of Mr. Hovnanian and an entity that he and his family owned. Mr. Hovnanian's investment in those similar transactions supports a finding that the francs transaction lacked economic substance.

### g. Other Considerations

Mr. Hovnanian asserts that because Rovakat was not sure it would earn income, any loss from the francs transaction was not certain to be used. We disagree. Mr. Hovnanian purchased ICP's interest in Rovakat during the last week of 2002, by which time he most likely knew whether some or all of the loss could be used for that year. In addition, we doubt that Mr. Hovnanian would have paid $13,000 to De Castro for its tax opinion if he did not expect that the loss could be used. Further, notwithstanding whether Rovakat realized any income, the loss passed through to Mr. Hovnanian who in turn was entitled to carry forward and to apply any unapplied portion of the loss against his future income (e.g., his salary and any bonus he received as to the WIC lawsuit).[19]

### h. Summary of Subjective Business Purpose

We conclude that Rovakat's reasons for entering into the francs transaction do not demonstrate a legitimate profit motive. The lack of arm's-length dealing at almost every stage of the francs transaction, coupled with the lack of mutuality of profit

---

[19]Mr. Hovnanian fails to explain why Rovakat did not pass through the entire loss in 2002, the year in which it was reportedly incurred. Instead, Rovakat suspended some of the loss at the partnership level and in later years recognized at the partnership level portions of the suspended loss as needed to offset its partners' income. Respondent asserts, and we agree, that such a suspension of the loss was improper. We consider Rovakat's improper reporting of its claimed loss as another attempt to hide the illegitimacy of the francs transaction.

objective by all parties, suggests that a nontax profit was a primary driver for entering into the francs transaction. Mr. Hovnanian's investment in two similar transactions also suggests that Rovakat was motivated mostly by tax considerations when entering into the francs transaction. On balance, we conclude that the economic reality of the francs transaction is not consistent with a bona fide profit objective.

### 4. Summary of Economic Substance

We conclude that the francs transaction lacked economic substance. Because a transaction that lacks economic substance is not recognized for Federal tax purposes, and "'cannot be the basis for a deductible loss'", see ACM Pship. v. Commissioner, 157 F.3d at 247 (quoting Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991), affg. Fox v. Commissioner, T.C. Memo. 1988-570), we hold that Rovakat is not entitled to the losses claimed on its 2002 through 2004 returns.[20]

---

[20]We are not unmindful that Rovakat realized an economic gain of $1,283 from the francs transaction. Because respondent does not contend that this gain is taxable to Rovakat or to Mr. Hovnanian, we hold it is not. Cf. Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991) ("If a transaction is devoid of economic substance * * * it simply is not recognized for federal taxation purposes, for better or for worse"), affg. Fox v. Commissioner, T.C. Memo. 1988-570.

III.  Omitted Income

    A.  Overview

    Respondent determined that Rovakat's 2003 gross income includes $90,443 which was paid to Limited through WASI on March 24, 2003.  In addition, respondent amended his answer to assert that Rovakat omitted $650,000 in income from its 2002 gross income.  As to the latter, respondent asserts that Rovakat failed to recognize the (1) $593,125 received from Limited on December 31, 2002, and (2) $56,875 paid to Limited, through WASI, on or about November 22, 2002.  We agree with respondent that Rovakat omitted income for 2002 but only to the extent of the $593,125.

    Gross income includes "all income from whatever source derived, including (but not limited to) * * * gross income derived from business".  Sec. 61(a)(2).  Under section 451(a), items of gross income generally must be included in the gross income of a cash method taxpayer in the taxable year in which the taxpayer actually or constructively received that income.  See sec. 1.451-1(a), Income Tax Regs.  Income not actually reduced to a taxpayer's possession is constructively received by a taxpayer in the year during which the income is credited to an account, set apart, or otherwise made available so that the taxpayer may draw upon it at any time.  See sec. 1.451-2(a), Income Tax Regs.  Income is not constructively received if the taxpayer's control

of its receipt is subject to substantial limitations or to restrictions. See id.

B. Payments From Limited

Limited deposited $593,125 in Rovakat's bank account on December 31, 2002. Mr. Hovnanian concedes that Rovakat was required to recognize the $593,125 as income but maintains that the amount was a "refundable prepaid deposit" includable in Rovakat's 2003 gross income. The $593,125 is not includable in Rovakat's 2002 income if it is a deposit. See Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 213 (1990). The $593,125 is includable in Rovakat's 2002 income if it is an advance. See Schlude v. Commissioner, 372 U.S. 128, 134 (1963).

Respondent seeks to prevail on this issue by relying on the record as a whole, the 2002 return, and the invoices between Rovakat, Limited, and WASI. On the basis of these documents, we are satisfied that respondent has met his burden of proof. Limited deposited the $593,125 payment into Rovakat's bank account during 2002. Neither of the two invoices submitted by Rovakat to Limited in connection with the $593,125 payment states that the payment was subject to a contingency. Nor does the record contain any document that establishes the existence of a contingency that would negate inclusion of the payment in 2002 under sections 61 and 451. See Commissioner v. Indianapolis Power & Light Co., supra at 211 ("Whether these payments

constitute income when received * * * depends upon the parties'
rights and obligations at the time the payments are made.").

Moreover, Rovakat reported as income on its 2003 return a
$943,192 payment received from Limited for "consulting" services
on March 25, 2003. Rovakat did not report any portion of the
$593,125 payment as income on its 2003 return even though Mr.
Hovnanian asserts that the income was taxable to Rovakat in that
year. Nor did Rovakat file an amended 2003 return to include
that payment in its gross income for that year. See sec. 1.451-
1(a), Income Tax Regs. ("If a taxpayer ascertains that an item
should have been included in gross income in a prior taxable
year, he should, if within the period of limitation, file an
amended return and pay any additional tax due."). We hold that
Rovakat was required to report the $593,125 payment received from
Limited in 2002.

C.  Payments to WASI

Respondent also determined that Rovakat was required to
report as income (1) $56,875 of the $650,000 which Limited
received from WASI on November 22, 2002, and (2) $90,443 of the
$1,033,635 which Limited received from WASI on March 24, 2003.
According to respondent, these amounts represent "implicit
deductions" claimed by Rovakat. We disagree.

The definition of gross income encompasses all undeniable
accessions to wealth, clearly realized, and over which a taxpayer

has complete dominion and control.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  While broad, the definition of gross income does not contemplate income that does not result in a realizable economic benefit to the taxpayer.  United States v. Goldberg, 330 F.2d 30, 39 (1964) (citing Burnet v. Wells, 289 U.S. 670 (1933), and Corliss v. Bowers, 281 U.S. 376 (1930)).  Rovakat realized no apparent economic benefit from the fees of $56,875 and $90,443.  Respondent's contention that Mr. Hovnanian seeks an implicit deduction from these fees is without merit because Rovakat did not report these fees as deductions on its 2002, 2003, or 2004 returns.  We hold that Rovakat need not recognize as income the fees of $56,875 and $90,443.

IV.  Effect of Omitted Income on 2002 Period of Limitations

Mr. Hovnanian asserts that the period of limitations as to Rovakat's 2002 taxable year is closed.  Respondent counters that the period remains open because Rovakat omitted from its 2002 return an amount in excess of 25 percent of the amount of gross income required to be stated on that return.  We agree with respondent.

The Commissioner generally must assess tax within 3 years after a return is filed.  See sec. 6501(a).  Section 6501(e)(1) provides an exception, however, where the taxpayer fails to report gross income in excess of 25 percent of the amount of gross income stated on its return.  Section 6229 sets forth

special rules to extend the period of limitations described by section 6501 with respect to partnership items or affected items. Section 6229(a) generally provides that the period for assessing against a person any income tax attributable to a partnership item or to an affected item shall not expire before the date that is 3 years after the later of the date that the partnership return is filed or the last day for filing the return. Section 6229(c)(2) provides that if any partnership omits from gross income an amount properly includable therein that is in excess of 25 percent of the amount of gross income stated on its return, the 3-year period described in section 6229(a) is extended to 6 years. Highwood Partners v. Commissioner, 133 T.C. 1, 10 (2009).

Mr. Hovnanian filed Rovakat's 2002 return on October 23, 2003, and the return reported no gross income. The $593,125 omitted from Rovakat's 2002 return was in excess of 25 percent of the amount of gross income stated on the return. Respondent issued Mr. Hovnanian the FPAA for 2002 on November 13, 2008, within the 6-year period for assessment provided by sections 6229(c)(2) and 6501(e)(1)(A). Accordingly, respondent timely issued the FPAA for 2002, and the adjustments set forth in that FPAA are not barred by any limitations period.

## V. Liability for Self-Employment Tax

Respondent determined that the $593,125 and $943,192 paid to Rovakat in 2002 and 2003, respectively, were self-employment

income.[21]  Section 1401 imposes a tax on self-employment income.
Sec. 1401(a) and (b); Schelble v. Commissioner, 130 F.3d 1388,
1391 (10th Cir. 1997), affg. T.C. Memo. 1996-269.  Self-
employment income includes an individual's distributive share of
income from a partnership.  Sec. 1402(a); sec. 1.1402(a)-2(d),
(f), Income Tax Regs.

Rovakat received $593,125 and $943,192 in 2002 and 2003,
respectively.  Limited paid these amounts through WASI as fees.
Neither the 2002 nor the 2003 return reported these amounts as
self-employment income.  They were and should have been reported
as such.  See sec. 1402(a).

---

[21]The FPAA for 2003 determined that Rovakat's self-
employment income was $1,536,317, which apparently is the sum of
the $593,125 and $943,192 Rovakat received in 2002 and 2003,
respectively.  On brief, respondent asserts that Rovakat's self-
employment income was $650,000 and $1,033,635 for 2002 and 2003,
respectively.  We attribute the increased amounts to respondent's
determination that Rovakat's gross income includes the $56,875
and the $90,443.  We have held supra that those amounts are not
includable in Rovakat's income.

## VI.  Entitlement to Deductions

Respondent determined that Rovakat was not entitled to deduct "other expenses" of $63,964 and $352,663 for 2003 and 2004, respectively.[22]  We agree.

Deductions are strictly a matter of legislative grace, and a taxpayer bears the burden of producing sufficient evidence to substantiate any deduction that would otherwise be allowed by the Code.  Sec. 6001; Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Rovakat did not present any evidence to substantiate the actual payment of the "other expenses" claimed on its 2003 and 2004 returns or that these payments were ordinary and necessary to Rovakat's activity.  See secs. 162(a), 212.  We conclude that Rovakat may not deduct any portion of those claimed expenses.

## VII.  Accuracy-Related Penalties

### A.  Overview

Section 6662(a) and (b)(1), (2), and (3) provides that a taxpayer may be liable for a 20-percent accuracy-related penalty on the portion of an underpayment of income tax attributable to, among other things, negligence or disregard of rules or

---

[22]We conclude that respondent has conceded his determination that Rovakat may not deduct charitable contributions of $6,224 for 2003 and $60,350 for 2004, by virtue of the fact that respondent did not address that issue at trial or in his posttrial brief.  Cf. Harbor Cove Marina Partners Pship. v. Commissioner, 123 T.C. 64, 66 (2004).

regulations, a substantial understatement of income tax, or a
substantial valuation misstatement.  Section 6662(h)(1) increases
the 20-percent rate to a 40-percent rate to the extent that the
underpayment is attributable to a gross valuation misstatement.
Sec. 6662(h)(1).  An accuracy-related penalty under section 6662
does not apply to any portion of an underpayment of tax for which
a taxpayer had reasonable cause and acted in good faith.  Sec.
6664(c)(1).

Respondent determined that one or more of the referenced
accuracy-related penalties apply with respect to the partnership
adjustments for Rovakat's 2002 through 2004 taxable years.
Respondent determined that the 40-percent accuracy-related
penalty applies to the portion of any underpayment of tax
attributable to the ordinary losses reported for 2002, 2003, and
2004.  Respondent determined that a 20-percent accuracy-related
penalty applies to any underpayment of tax attributable to the
omitted income and to the disallowed deductions.  Mr. Hovnanian
does not deny that the accuracy-related penalties apply in
accordance with their terms.  His sole defense against the
imposition of the accuracy-related penalties is that Rovakat
meets the reasonable cause exception of section 6664.[23]

_____

[23]The Commissioner bears the burden of production on whether
an accuracy-related penalty applies "with respect to the
liability of any individual".  See sec. 7491; Higbee v.
Commissioner, 116 T.C. 438, 446-447 (2001).  We have previously

(continued...)

B.  Gross Valuation Misstatement

Respondent determined that it was appropriate to impose an accuracy-related penalty of 40 percent under section 6662(h) for a gross valuation misstatement with respect to the basis reported on the francs transaction.  Section 6662(h) provides that a taxpayer may be liable for a 40-percent penalty on that portion of an underpayment of tax that is attributable to one or more gross valuation misstatements.  A gross valuation misstatement exists if the value or adjusted basis of any property claimed on a tax return is 400 percent or more of the amount determined to be the correct amount of such value or adjusted basis.  Sec. 6662(h)(2)(A).  The value or adjusted basis of any property claimed on a tax return that is determined to have a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount.  Sec. 1.6662-5(g), Income Tax Regs.  Whether there is a gross valuation misstatement in the partnership context is determined at the partnership level.  Sec. 1.6662-5(h)(1), Income Tax Regs.

---

[23](...continued)
questioned whether sec. 7491 applies in the partnership context, given that the section applies only to the liability of "any individual".  See, e.g., Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288; Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104.  We need not decide that question here because we find that the record establishes that the criteria for the imposition of the sec. 6662(a) accuracy-related penalties is met without regard to the burden of production.

In <u>Merino v. Commissioner</u>, 196 F.3d 147, 158–159 (3d Cir. 1999), affg. T.C. Memo. 1997–385, the Court of Appeals for the Third Circuit held that imposition of a valuation misstatement penalty is generally appropriate where a claimed tax benefit is disallowed because it is an integral part of a transaction determined to lack economic substance.  We found that the francs transaction was a sale or, alternatively, that it lacked economic substance.  Rovakat's basis in the francs as reported on its returns exceeds 400 percent of the basis that Rovakat actually had.[24]  Consequently, an accuracy-related penalty under section 6662(a) on account of a gross valuation misstatement under section 6662(h) applies through its terms to that portion of any underpayment of tax attributable to the reported loss.[25]

C.  <u>Other Accuracy-Related Penalties Determined</u>

Respondent determined that Rovakat is liable for the 20-percent accuracy-related penalty under section 6662(a) as to the portion of any underpayment of tax attributable to the remaining adjustments on account of negligence or disregard of rules or regulations, substantial understatement of income tax, and/or

---

[24]We conclude from the record that Rovakat's basis in the francs was $34,185 because the francs transaction was a sale, see sec. 1012, or, alternatively, that the basis was zero because the francs transaction lacked economic substance.

[25]Given that holding, we do not consider the applicability of a 20-percent accuracy-related penalty on that portion of the underpayment of tax attributable to the reported losses.

substantial valuation misstatement under section 6662(b)(1), (2), and (3).  Only one accuracy-related penalty may be applied with respect to any portion of an underpayment, even if that portion resulted from more than one of the types of misconduct described in section 6662.  Sec. 1.6662-2, Income Tax Regs.  The record establishes (and Mr. Hovnanian does not contest) that the determined accuracy-related penalties apply absent a mitigating reason.

D.  Reasonable Cause

Mr. Hovnanian argues that the accuracy-related penalties may not be imposed because Rovakat meets the reasonable cause defense of section 6664(c)(1).  Pursuant to that section, an accuracy-related penalty under section 6662(a) may not be imposed with respect to any portion of an underpayment of tax for which Mr. Hovnanian establishes that Rovakat, through his actions, had reasonable cause and acted in good faith.[26]  Whether a taxpayer acted with reasonable cause and in good faith is a factual determination, in which the taxpayer's effort to assess the proper level of tax is of utmost importance.  See sec. 1.6664-4(b)(1), Income Tax Regs.

---

[26]We determine the application of the reasonable cause defense in this partnership-level proceeding because Mr. Hovnanian claims that the defense applies on account of his actions as Rovakat's managing member and tax matters partner. See Am. Boat Co., LLC v. United States, 583 F.3d 471, 480 (7th Cir. 2009); 106 Ltd. v. Commissioner, 136 T.C. 67, 75-77 (2011); Fears v. Commissioner, 129 T.C. 8, 10 (2007).

Mr. Hovnanian argues that Rovakat reasonably relied on the Rovakat opinion and on the Sidley Austin opinion when filing Rovakat's 2002 through 2004 returns. A taxpayer's reliance on the advice of a professional, such as an attorney, may constitute reasonable cause and good faith where the taxpayer proves by a preponderance of the evidence that: (1) The taxpayer reasonably believed that the professional upon whom the reliance is placed is a competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also sec. 1.6664-4(c)(1), Income Tax Regs. On the basis of the record as a whole, we conclude that Mr. Hovnanian has not satisfied all of these requirements.

As to the Rovakat opinion, Mr. Hovnanian had no personal contact with the attorneys who rendered that opinion. Instead, he relied solely on the recommendation of Mr. Valdez, the person who promoted the transaction to be opined upon. See Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121 (defining a promoter as "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction"). Mr. Hovnanian knew that Mr. Valdez structured and promoted the francs transaction, and we

find in the record that the Rovakat opinion was simply a product that Mr. Valdez essentially included as part of his "investments" to attempt to insulate his clients from the imposition of an accuracy-related penalty as to his transactions.

Nor did Mr. Hovnanian reasonably rely on the Rovakat opinion in that the opinion contained material misstatements of fact or otherwise did not properly explain the facts. Cf. Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 209 (D. Conn. 2004), affd. 150 Fed. Appx. 40 (2d Cir. 2005). First, the Rovakat opinion stated that Mr. Hovnanian was not affiliated with any member of Rovakat or of ICP; Mr. Hovnanian owned an interest in Rovakat, and he managed ICP. Second, the Rovakat opinion stated that Rovakat's principal business activity was "trading personal property for the account of owners of interest in the activity"; Mr. Hovnanian admitted during his testimony that Rovakat never intended to invest in francs. Third, the Rovakat opinion stated that the parties to the "transaction" entered into the francs transaction for "business reasons independent of the tax consequences for tax purposes, with a view toward making a profit on the activities contemplated in the Transaction"; the opinion never elaborates on this purported "business purpose". Fourth, the Rovakat opinion stated that the parties to the "transaction" dealt with each other at arm's length; the francs

transaction was not conducted at arm's length but orchestrated exclusively by Mr. Valdez.[27]

Nor do we find that Mr. Hovnanian relied in good faith on the Rovakat opinion's conclusion that Rovakat realized a $5,769,532 loss as to a transaction that resulted in a $1,283 economic gain. In determining whether a taxpayer relied in good faith on the advice of a professional, we consider (1) the taxpayer's business sophistication and experience, (2) the reasonableness of the advice solicited, and (3) whether the advice was obtained as part of a tax shelter. See 106, Ltd. v. Commissioner, 136 T.C. 67, 77-78 (2011); see also sec. 1.6664-4(b)(1), Income Tax Regs. Each factor weighs against a finding that Mr. Hovnanian relied in good faith on the Rovakat opinion. As a business executive with more than 20 years of experience and an economics degree from the University of Pennsylvania, Mr. Hovnanian obviously recognized the incongruity of reporting a loss in excess of $5 million on a transaction that

_____

[27]In addition, the Rovakat opinion contained numerous disclaimers that served as notice to Mr. Hovnanian that the legal opinion was tenuous. The opinion states, for example, that "Congress has actively pursued legislation to curb abusive tax shelters and the media has publicized many of the tax transactions of now large bankrupt entities and high profile individuals. * * * The legislative and political climate and publicity may influence a court to accept the IRS arguments notwithstanding the merits of our analysis." The opinion states likewise that "We have * * * considered certain judicial doctrines which, if applicable, could affect our view of the facts described and our analysis".

yielded an economic gain.  We have stated that where an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of the investment is required.  Roberson v. Commissioner, T.C. Memo. 1996-335 (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), and Horn v. Commissioner, 90 T.C. 908, 942 (1988)), affd. without published opinion 142 F.3d 435 (6th Cir. 1998).  If Mr. Hovnanian's business prowess did not allow him to make such a determination, then certainly the fact that the Rovakat and ISP opinions were virtually identical in all material respects should have prompted inquiry from an independent adviser.  We conclude that any reliance which Mr. Hovnanian placed on the Rovakat opinion was not reasonable.

We similarly reject Mr. Hovnanian's claimed reliance on the Sidley Austin opinion.  Mr. Valdez procured the Sidley Austin opinion for the benefit of ICP and of himself.  That opinion makes no specific mention of Rovakat or of Mr. Hovnanian, and it was not given to Mr. Hovnanian until 2008.  The Sidley Austin opinion also turned the seemingly simple prospect of purchasing francs and contributing them to a partnership into a 74-page

guide on shifting losses from foreign entities to U.S. taxpayers. Any reliance that Mr. Hovnanian claims to have placed on the Sidley Austin opinion is not reasonable or is otherwise not supported by the record.

The Supreme Court observed long ago that an expert opinion may be had as to any amount. <u>Winans v. N.Y. & Erie R.R. Co.</u>, 62 U.S. 88, 101 (1958). Legal and tax opinions are no different. The mere fact that a taxpayer purchases an "opinion" from a self-professed expert does not necessarily mean that the taxpayer relied on the "expert" in good faith. An individual who blindly relies on a professional opinion to support a facially too good to be true transaction such as we have here does so at his or her own peril. Cf. <u>Neonatology Associates, P.A. v. Commissioner</u>, 115 T.C. at 99. Never has this been more true than in today's environment where taxpayers seek to reduce their tax liabilities by engineering artificial tax losses in complex and/or foreign transactions which leave little to no paperwork that the Commissioner may access to examine the transaction. We conclude that Rovakat, through Mr. Hovnanian, does not meet the reasonable cause defense of section 6664(c)(1). It follows that the accuracy-related penalties determined by respondent are applicable to the extent stated herein.

VIII.  <u>Epilogue</u>

    We have considered and rejected as without merit all arguments that Mr. Hovnanian made which are not addressed herein. To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.